IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

RANDALL LITTLE,                          §
Institutional ID No. 53592-048           §
                                         §
            Plaintiff,                   §
                                         §
v.                                       §        Civil Action No. 1:24-CV-00059-BU
                                         §
C. Stern, *et al.*,                      §
                                         §
            Defendants.                  §
                                         §

## FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
## OF THE UNITED STATES MAGISTRATE JUDGE

Plaintiff Randall Little, an inmate at F.C.I. Big Spring, brings this action against Defendants C. Stern, Dr. FNU Winger, Dr. FNU Wright, unnamed Bureau of Prisons (BOP) Nurses and Special Housing Unit (SHU) guards, and the United States BOP (collectively, "the Defendants"), alleging that they violated his constitutional rights. Little's claims are subject to judicial screening under 28 U.S.C. §§ 1915, 1915A because Little has been granted leave to proceed *in forma pauperis*, Dkt. No. 8, and he sues government officials, *see* Dkt. No. 1. For the reasons below, the Court should DISMISS Little's claims against all Defendants.

## I. JURISDICTION

Little brings his claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* for alleged violations of the United States Constitution, providing the

1

Court with subject-matter jurisdiction under 28 U.S.C. § 1331.[1] Dkt. No. 1. Venue is proper in the Northern District of Texas, Abilene Division, because Little's claims arise from his incarceration at F.C.I. Big Spring located in Howard County, Texas. 28 U.S.C. § 1391(b)(2). The undersigned has the authority to enter these Findings, Conclusions, and Recommendations after United States District Court Judge James Wesley Hendrix transferred Little's case to the undersigned for preliminary screening. Dkt. No. 9; 28 U.S.C. § 636(c)(1). Little has not consented to the undersigned exercising the full jurisdiction of this Court.

## II.  FACTUAL BACKGROUND

For purposes of screening a plaintiff's complaint under 28 U.S.C. §§ 1915(e)(2)(B) or 1915A, a court must accept well-pleaded factual allegations as true and construe them in a way that most favor the plaintiff. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017). A court may look to the plaintiff's allegations in their complaint, responses to a questionnaire, authenticated prison or jail records, and testimony provided at a *Spears* hearing. *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999); *see also Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may consider authenticated medical and prison records).

Randall Little alleges that from 2019 until 2023, BOP officials at F.C.I. Big Spring failed to provide adequate medical care for injuries he suffered and failed to properly treat or diagnose his chronic medical conditions. Dkt. No. 1 at 4–5. His complaint alleges a

---

[1] Liberal construction of Little's pleadings also raises claims under the Federal Tort Claims Act (FTCA). The FTCA includes an explicit jurisdictional grant to U.S. district courts to hear these claims. 28 U.S.C. § 1346(b)(1).

variety of medical conditions and several instances of allegedly inadequate treatment that can be grouped into three categories. First, Little alleges that, given his history of falls and the resulting neck and back fractures, he should have received more thorough treatment or better mobility aid devices. Second, Little alleges that his medical history reveals several other ailments and injuries that BOP staff failed to adequately diagnose or treat. Lastly, Little alleges that he requested transfer to a different facility to receive better care for his injuries, but that the warden at F.C.I. Big Spring denied his request.

### 1. Claims Arising from Fractures and Falls

Little's claims primarily arise from a fall he suffered in the SHU. Dkt. No. 19 at 20. Little alleges that the water in the SHU was so bad that he was unable to drink it, and that he was dehydrated as a result. *Id.* On May 15, 2022, Little was woken up for the morning count; after he stood up for the count and the officer walked past his cell, he immediately passed out from dehydration and fell. *Id.* He woke up with his neck bent to his left and was unable to straighten it. *Id.* Little had to sit between the bed and the table in his cell and wait for help. *Id.*

Thirty minutes later, an officer came by to serve lunch, and Little informed him of his injury. *Id.* The officer said that he would notify medical about Little's injury, but Little "sat there for over 2 hours waiting" before medical came down to help him. *Id.* Little alleges that this was because the officer initially did not call anyone down to help him. *Id.* Once medical finally arrived, Little was handcuffed and walked upstairs to see the nurses in the medical office. *Id.* at 21. Upon seeing his condition, the nurses urged the doctor on call to send Little to the hospital for treatment. *Id.* While in a belly chain and shackles,

Little was forced to walk to the front of the prison and climb into a prison van; after arriving at Scenic Mountain Medical Center, he then had to walk from the van to the emergency room. Dkt. Nos. 1 at 19, 19 at 21. No one at Big Spring provided Little a neck brace or C-collar during transport to the hospital. Dkt. Nos. 1 at 23, 19 at 21.

Once Little arrived at the emergency room, he was walked to an examination table and given a neck brace. Dkt. No. 19 at 21. The emergency room staff then performed an x-ray and CAT scan on Little. Dkt. No. 19 at 21. When the scans revealed that he had a fracture in his neck, he was finally "treated like [he] had a broken neck" and no longer required to move himself. *Id.* Little was transported by ambulance to a hospital in Lubbock, where his neck brace was replaced with a better one. *Id.* at 22. He was examined by a neurosurgeon and finally released back to Big Spring around 4:00 AM the following day, May 16. *Id.*

Later in the day on May 16, Little was assaulted by another inmate in front of the SHU cells and knocked down.[2] Dkt. No. 1-1 at 5. Following this incident, Little was moved to a separate cell. *Id.* X-ray imaging taken on May 19, 2022—shortly after both falls—revealed a new fracture in his lower back, which was not present in prior x-ray scans. Dkt. No. 1-1 at 5. The imaging also revealed that he had osteopenia, meaning he suffered from low bone density. *Id.* Little went back to the doctor in Lubbock four to six times between May and October 2022. Dkt. No. 19 at 22. On his final visit, he was released from further hospital visits and his neck brace was removed. *Id.* at 22–23.

---

[2] According to the authenticated medical records, Little was struck in the face and fell back on his buttocks; he told the medical staff that he had pain in his lower back.

Other than the above incident, Little's Complaint and the accompanying medical records described five other falls he suffered at Big Spring; all but one of these falls occurred before the May 2022 fall. On July 7, 2019, Little was dehydrated because the water in his cell was too terrible to drink; he was also sick with strep throat, which made it difficult to swallow. Dkt. No. 19 at 25. When Little went to speak with a correctional officer, he passed out from dehydration. *Id.* He was then taken to the medical office, where he was treated with antibiotics and rehydrated with an IV. *Id.* Little fell again on August 29, 2019, when he tripped over a door stop while going to the chow hall; because going up and down stairs posed a risk to him, Little was reassigned to first floor housing. Dkt. No. 1-1 at 4.

On March 15, 2021, Little tripped and fell for a third time, cutting his scalp in the process.[3] Dkt. No. 1-1 at 4. The doctor ordered x-ray imaging, which was returned on April 26, 2021, and revealed various moderate to mild defects in his lower spinal discs.[4] *Id.* Despite these abnormal findings, Little was not referred to an orthopedic specialist. *Id.* His fourth fall occurred on January 26, 2022, when Little tripped over a sidewalk seam and cut his brow; his cane, which was first assigned to him in early 2020, was replaced with a rolling walker following this incident.[5] Dkt. No. 19 at 26. Lastly, on January 27, 2023, Little fell while in the shower, injuring his head, hip, and left leg. Dkt. No. 1-1 at 4. Little alleges that he is unsure whether he fell because he tripped or because he fainted.[6] *Id.*

---

[3] Medical records show that he tripped on a loose tile in his cell.

[4] The April 2021 x-ray imaging is also the first in Little's medical record to report that he had osteopenia. As noted earlier, there was no lower back fracture reported in this x-ray.

[5] Little does not list his January 2022 fall in his Complaint, but it is disclosed in his medical records.

[6] According to the medical records of his accident, Little told staff that he did not lose consciousness, but instead slipped when he chose not to use the handicap help like he usually did.

Based on these facts, Little raises the following complaints. First, he alleges that he was improperly treated following his May 2022 fall because it took two hours for medical staff to arrive once he requested help, FCI Big Spring did not provide him with a C-collar during transport, and he was forced to walk around with a crooked neck while in shackles. Dkt. No. 19 at 20–21. Second, Little alleges that BOP staff failed to identify and treat his osteopenia, lower back fracture, or other vertebral anomalies, despite his x-ray imaging disclosing these conditions. Dkt. No. 1 at 22. Lastly, Little alleges that BOP staff failed to take preventative measures in response to his bone fractures and fainting episodes; he argues they should have performed a bone density test, performed a carotid artery doppler study, taken steps to rule out a heart condition or brain clot as potential causes of his fainting spells, or provided a walker with a seat or wheelchair to prevent future falls. Dkt. Nos. 1 at 19, 21, 1-1 at 2, 3.

## 2.   Claims Arising from Other Medical Issues

In addition to his claims arising from orthopedic injuries and falls, Little's Complaint discusses other inadequately-treated conditions that either compounded the risk of a falling injury or posed unique risks to Little.

First, Little alleges that the electrocardiogram (EKG) performed while he was at the emergency room on May 15, 2022, revealed that he had a left bundle branch block. Dkt. No. 1-1 at 5. Hematology results in Little's medical records dating back to 2019 also reported that he had low platelets, which allegedly increased Little's risk of internal bleeding if he fell. Dkt. No. 1-1 at 4. BOP staff did not notify Little about either condition; as a result, Little did not learn about either condition until December 13, 2023, when he

6

received his medical records and had an inmate doctor interpret them.[7] Dkt. Nos. 1-1 at 10, 19 at 27.

Next, Little alleges that he suffers from chest pain and shortness of breath. Dkt. No. 1 at 18. His symptoms first developed after he contracted Covid-19 in September 2020. Dkt. No. 1-1 at 4. The nurse he spoke to allegedly ignored his complaints on this issue. Dkt. No. 1 at 18. Little also complains that a pulmonary function test was not performed to address his condition. Dkt. No. 1-1 at 3.

Little has also been diagnosed with osteoarthritis and cataracts. He alleges that he has arthritis in his knees, which the BOP has known about since 2014. Dkt. No. 1 at 17. He was prescribed Tylenol daily to address the pain, but at some point stopped taking it. Dkt. No. 19 at 26. Little was also diagnosed with cataracts on November 20, 2019, which causes him visual difficulties. Dkt. Nos. 1 at 17, 1-1 at 4. While Little does not allege that the BOP has failed to treat his arthritis or cataracts, he suggests that they compound his risk of falling and injuring himself. Dkt. No. 1 at 17.

Lastly, Little alleges that blood was found in his stool in 2019. Dkt. No. 1-1 at 4. Big Spring medical staff performed a stool test in 2021, but no blood was found. Dkt. No. 19 at 28. Little alleges that the BOP has not given him a colonoscopy, despite his age and the blood found in his stool. Dkt. Nos. 1 at 20, 1-1 at 4. However, Little also admits that he refused a colonoscopy the BOP offered because a prior inmate suffered a perforated colon

---

[7] Both the bundle branch block and low platelet results were explicitly noted in his medical records, suggesting that the inmate doctor merely pointed these results out to him rather than perform an independent diagnosis. While some of Little's platelet results were marked "low," others fell within the normal range, and none were flagged as "low critical."

during a colon check. Dkt. No. 19 at 28.

### 3. Claim Arising from Denied Transfer Request

Little's final claim concerns his request for a lateral facility transfer to receive better treatment for his illnesses. Following Little's neck injury in May 2022, he was unable to participate in Vocational Training; Little had no other income and could not keep up with his Financial Responsibility Program (FRP) payments. Dkt. No. 1-1 at 1, 13. As a result, his FRP status was marked as non-compliant or "REFUSED," and he was told he did not qualify for lateral transfer. *Id.* at 1, 6, 13.

On December 20, 2023, Little filed a BP-8 request that his FRP status be changed from "REFUSED" to "EXEMPT" in light of his inability to work. *Id.* at 9, 13. Little also argued that, given his medical conditions and recorded incidents, he should have been transferred from his care level II facility to a care level III facility. *Id.* at 3. Little specifically requested transfer to Terminal Island, which was the closest level III facility to his home state of Nevada. *Id.* at 9, 11.

Little's BP-8 was partially granted; on February 9, 2024, his FRP status was changed to exempt, but BOP staff determined that transfer to a care level III facility was not medically necessary. *Id.* at 11–12. Little filed a BP-9 renewing his request, arguing that his health conditions and attached medical history warranted transfer to a Level III facility. *Id.* at 11. This request was allegedly denied by the Warden;[8] by the time he was notified of the

---

[8] The copy of Little's BP-9 does not include the BOP's response, which would otherwise indicate whether the Warden denied his request and why. Dkt. No. 1-1 at 11. Little explains that he was not given a copy of the grievance denial, but was told that the Warden denied his BP-9 and that he did not meet the Level III transfer criteria. Dkt. No. 1 at 7–8.

denial, it was too late to file a BP-10 or BP-11. Dkt. Nos. 1 at 6–7, 19 at 20.

### III.  THE PARTIES

Little brings Eighth Amendment claims against the following defendants: (1) Defendant C. Stern, Warden of FCI Big Spring during the alleged violations; (2) Dr. FNU Winger, Medical Director at the time of Little's injuries; (3) Dr. FNU Wright, Little's physician who later became Medical Director; (4) the BOP Nurses on duty during April 2022; (5) the SHU guards on duty during April 2022; and (6) the United States Bureau of Prisons. Dkt. No. 1 at 2–3. For screening purposes, the Court accepts as true that each of the individual defendants is a federal official.

Little's allegations potentially implicate two different types of torts. First, Little brings *Bivens* claims against each defendant in their official capacity. *Id.* In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, the Supreme Court recognized an implied constitutional tort claim for money damages against federal officials. 403 U.S. 388, 397 (1971). But since then, the Supreme Court "has approved of an implied damages remedy under the Constitution itself" only three times; of relevance here, the Supreme Court held in *Carlson v. Green*, 446 U.S. 14 (1980) that "the Eighth Amendment Cruel and Unusual Punishments Clause gave [a prisoner] a damages remedy for failure to provide adequate medical treatment." *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017). Here, Little seeks to bring Eighth Amendment claims based on failure to provide adequate medical treatment, and seeks $5,000,000.00 in damages. Dkt. No. 1 at 3–4, 23. Thus, to the extent his claims are based on the right to medical treatment rather than other Eighth Amendment rights, they may potentially be asserted through *Bivens*.

9

But a *Bivens* remedy is available only against *federal officials* in their *personal* capacity; here, Little sues the individual defendants in their *official* capacities, alongside a federal agency. Dkt. No. 1 at 1–3. Official capacity claims against federal officials are essentially claims against the United States, as are claims against federal agencies. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A] plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."); *Williamson v. U.S. Dep't of Agric.*, 815 F.2d 368, 373 (5th Cir. 1987) ("[Sovereign immunity] renders the United States, its departments, and its employees in their official capacities as agents of the United States immune from suit[.]"). And the United States can only be sued directly if it has waived sovereign immunity. *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").

The United States has not waived its sovereign immunity to *Bivens* claims for damages or injunctive relief. *Garcia v. United States*, 666 F.2d 960, 966 (5th Cir.1982) (affirming dismissal of *Bivens* claim against United States because neither *Bivens* nor the Constitution waived the government's sovereign immunity). Thus, while Little "may bring a *Bivens* action against individual officers . . . he may not bring an action against the United States, the BOP, or BOP officers in their official capacities as such claims are barred by the doctrine of sovereign immunity." *Gibson v. Fed. Bureau of Prisons*, 121 F. App'x 549, 551 (5th Cir. 2004).

The second type of tort implicated here is a medical malpractice claim under the Federal Tort Claims Act (FTCA). When passing the FTCA, Congress authorized plaintiffs

to bring suits in federal court to obtain compensation from the United States for the torts of its employees. In relevant part, the statute states:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).[9]

Although Little has not expressly invoked the FTCA, his claims could reasonably be construed as simple medical negligence claims under the FTCA. Indeed, Little frequently forgoes accusations of deliberate indifference and instead couches his allegations in terms of "medical malpractice," "medical neglect," "failure to diagnose," and violations of the "standard of health care." *See generally* Dkt. No. 1. Little also pleads in the alternative that his facts should allow him "to claim medical malpractice[.]" Dkt. No. 1 at 18–19. Unlike with *Bivens* claims, the federal government has waived its sovereign immunity to FTCA claims. *See, e.g., Levin v. United States*, 568 U.S. 503, 506 (2013) (noting that the FTCA was intended to "remove the sovereign immunity of the United States from suits in tort"). Thus, Little's official capacity claims may be asserted through the FTCA.

Applying principles of liberal construction to Little's allegations reveals two possible paths for Little's claims. First, a *Bivens* claim, but construed against each defendant in their personal capacity instead of their official capacity. Second, an FTCA claim against

---

[9] The FTCA relevant statutes are 28 U.S.C. §§ 1346, 2671-2680.

the United States based on the medical negligence of its employees while they were acting within the scope of their employment with the BOP. So construed, the undersigned will address the plausibility of both types of claims.

## IV.  LEGAL STANDARDS

A court must dismiss a complaint filed *in forma pauperis* or filed by a prisoner against a government entity or employee if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B); 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*).

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests upon clearly baseless factual contentions, while it lacks an arguable basis in law if it contains indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

Dismissal for failure to state a claim—whether under Section 1915(e)(2)(B)(ii), Section 1915A(b)(1), or Rule 12(b)(6)—"turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief, the claims should not be dismissed merely because the plaintiff fails to

articulate the proper legal theory that otherwise makes those facts actionable in court. *Johnson*, 574 U.S. at 11–12 (citing Fed. R. Civ. P. 8(a)(2)–(3), (d)(1), (e)).

Courts accept *well-pleaded* factual allegations as true. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). This means the factual allegations, while not required to be detailed, must amount to more than mere labels, conclusions, or a statement of the legal elements of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Chhim*, 836 F.3d at 469.

For claims to be substantively plausible, a plaintiff need not establish that the pleaded facts probably occurred as alleged, but the facts must allow the court "to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678–679). Even pro se plaintiffs must plead facts that raise the right to relief above a speculative level. *Chhim*, 836 F.3d at 469 (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)). And when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When evaluating a complaint under these standards, courts liberally construe the pleadings of pro se plaintiffs, holding their complaints to "less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "liberal construction does not require that the Court . . . create causes of action where there are none." *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013). "To demand otherwise would require the 'courts to explore exhaustively all potential claims of a *pro se* plaintiff'" and would "'transform the district

13

court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.'" *Jones v. Mangrum*, No. 3:16-cv-3137, 2017 WL 712755, at *1 (M.D. Tenn. Feb. 23, 2017) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

## V. ANALYSIS

As discussed above, Little's claims against the Defendants may be liberally construed through one of two avenues: a *Bivens* action asserted against the Defendants in their individual capacities, or an FTCA claim against the Defendants in their official capacities. As part of the screening process, the undersigned must first determine whether "the claims asserted are barred by the applicable statute of limitations[;]" if so, "those claims are properly dismissed pursuant to § 1915." *Gonzalez v. Wyatt*, 157 F.3d 1016, 1019–20 (5th Cir. 1998) (quoting *Gartrell v. Gaylor*, 981 F.2d 254, 256 (5th Cir. 1993)). For any claims that are not barred, the undersigned will then examine the merits to determine if any survive judicial screening.

### A. Statute of Limitations Analysis

#### 1. *Applicable Statute of Limitations*

Assessment of the statute of limitations begins with a determination of the applicable limitations period. Here, the limitations period for Little's claims depends on whether

14

the claims are construed as *Bivens* actions or FTCA actions. A *Bivens* action takes its statute of limitations from state law rather than federal law. *Brown v. Nationsbank Corp.*, 188 F.3d 579, 590 (5th Cir. 1999) (citing *Alford v. United States,* 693 F.2d 498, 499 (5th Cir.1982) (per curiam)). In Texas, the applicable limitations period is two years from the date the cause of action accrued. *Brown*, 188 F.3d at 590 (citing *Pena v. United States,* 157 F.3d 984, 987 (5th Cir.1998)).

Conversely, the FTCA's limitations period is established by federal statute. A tort claim must be presented to the relevant government agency within two years of the accrual date; once a notice of final denial is received, the claimant then has six months to file suit in court. 28 U.S.C. § 2401(b). A federal court has no jurisdiction to adjudicate an FTCA claim that has not been presented to the agency for resolution. § 2675(a); *Barber v. United States*, 642 F. App'x 411, 413 (5th Cir. 2016) (recognizing presentment as a jurisdictional prerequisite to bring an FTCA claim). Failure to meet either FTCA deadline renders the claim "forever barred," absent equitable tolling as discussed further below. § 2401(b).

Because both *Bivens* and FTCA actions are asserted as federal claims, they share the same accrual rules. Federal claims accrue "when the plaintiff knows or has reason to know of the injury which **is** the basis of the action." *Brown*, 188 F.3d at 589–90 (quoting *Moore v. McDonald*, 30 F.3d 616, 620–21 (5th Cir.1994)). A plaintiff knows of their injury when they are aware both that the injury exists and that it is connected to the defendant's actions. *Brown*, 188 F.3d at 590.

The knowledge requirement for accrual of federal claims is further reflected by the federal discovery rule. Under the discovery rule, accrual of a cause of action is deferred

15

"until the plaintiff knew or, exercising reasonable diligence should have known of the facts giving rise to the cause of action." *Shelby v. City of El Paso, Tex.*, 577 F. App'x 327, 331 (5th Cir. 2014) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex. 1996)). However, it is not required that the plaintiff realize he has a legal cause of action, provided he knows of the facts that would ultimately support a claim. *See Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir.1983) (noting that a claim accrued when the facts would lead a reasonable person to either conclude there was a causal connection to the defendant's conduct, or seek professional advice that would lead to the same conclusion).

### 2.  *Application to* **Bivens** *Claims*

Applying these rules to Little's *Bivens* claims, in which he asserts violations of his Eighth Amendment right to adequate medical care, each claim accrued on the date he knew or should have known (1) of his constitutional injury, and (2) that his injury was connected to the Defendants' actions. Little filed his Complaint on April 29, 2024. Dkt. No. 1. Thus, any *Bivens* claims accruing before April 29, 2022—two years before his Complaint was filed—fall outside the statute of limitations and are barred.

Here, there are four sets of claims which accrued within the limitations period: (1) the claims arising from treatment of his neck injury, which accrued on or after the injury occurred on May 15, 2022;[10] (2) the claims arising from his most recent fall, which accrued when the fall occurred on January 27, 2023;[11] (3) the claims arising from failure to treat

---

[10] Dkt. No. 19 at 20.
[11] Dkt. No. 1-1 at 4.

conditions first disclosed in his medical records, which accrued when he received those records on December 13, 2023;[12] and (4) the claims arising from his requested care level III transfer, which accrued on February 22, 2024, when he learned that the warden denied his request.[13]

Little's remaining *Bivens* claims fall outside of the limitations period. Little reports four falls occurring between July 7, 2019, and January 26, 2022;[14] each of these falls occurred before April 2022, and thus claims arising from these incidents accrued outside the two-year limitations period. Little also alleges that the Defendants should have provided a colonoscopy once blood was found in his stool. Dkt. Nos. 1 at 20, 19 at 28. Setting aside that Little rejected the colonoscopy that Big Spring offered, Dkt. No. 19 at 28, the offending stool test occurred in 2019. Dkt. No. 1-1 at 4. Thus, it also falls outside the *Bivens* limitations period.

Next, Little alleges that one of the prison nurses seemed to ignore his complaints about shortness of breath and chest pain. Dkt. No. 1 at 18, 1-1 at 4. Little does not specify when these symptoms arose or when he complained to the nurse, but notes that these conditions began sometime after contracting Covid-19 in August 2020—nearly four years before filing his claim in this Court. *Id.* Given this context, the undersigned finds that Little has not plausibly alleged that his claim accrued within the limitations period.

---

[12] Dkt. No. 1-1 at 10. These conditions include his lower back fracture, osteopenia, low blood platelets, and bundle branch block. Dkt. Nos. 1-1 at 5, 1-1 at 10, 19 at 27. While these conditions may have begun prior to the limitations period, he was not aware of enough facts to support a constitutional claim until he received his medical records, learning that these conditions existed and had not been treated.

[13] Dkt. Nos. 1 at 7–8, 19 at 23.

[14] Dkt. Nos. 1-1 at 4, 19 at 25.

Lastly, Little alleges that he was diagnosed with arthritis in 2019 and cataracts in 2020. Dkt. Nos. 1 at 16–17, 1-1 at 4. Little never alleges that the Defendants inadequately treated these conditions; he notes only that he stopped receiving Tylenol for his arthritis at some point, but does not allege wrongdoing based on this fact. Dkt. No. 19 at 26. The lack of alleged wrongdoing, when paired with the remote dates he was first diagnosed, make it implausible that Little could allege claims accruing within the limitations period.

### 3. *Application to FTCA Claims*

Applying the limitations rules to Little's FTCA claims leads to a similar conclusion. The FTCA requires Little to present his tort claims to the relevant agency within two years of accrual. 28 U.S.C. § 2401(b); *see also McNeil v. United States*, 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."). This requirement imposes not only a statute of limitations, but also a jurisdictional limit on the court's ability to adjudicate FTCA claims. § 2675(a)

Here, Little has not alleged that he presented any of his malpractice grievances to the BOP for resolution.[15] Failure to allege presentment deprives this Court of jurisdiction over Little's FTCA claims, which is sufficient to compel their dismissal. Said dismissal is effectively with prejudice for any claims that that accrued more than two years before he filed this action because they are "forever barred" by the FTCA's statute of limitations; thus, all claims that accrued outside the two-year *Bivens* window are also forever barred

---

[15] Little has alleged exhaustion of his administrative remedies when his BP-9 requesting facility transfer was denied by the warden. Dkt. No. 1 at 6–8. However, the BOP grievance procedure for administrative remedies is separate from its FTCA claims procedure. *Lopez-Heredia v. Univ. of Texas Med. Branch Hosp.*, 240 F. App'x 646, 647 (5th Cir. 2007) (citing 28 C.F.R. § 543.30–543.32). Little never alleges that he exhausted his remedies within the BOP's FTCA claims procedure.

by the FTCA's two-year presentment requirement. The remaining FTCA claims within the limitations period are instead dismissed with leave to exhaust the BOP's FTCA claims process. *McNeil*, 508 U.S. at 113. Regardless, Little's failure to allege that he presented his FTCA claims to the BOP requires dismissal of all of his FTCA claims.

### 4. *Tolling Analysis*

The undersigned must also determine whether any of Little's claims are saved by equitable tolling. The statute of limitations for a claim may be "tolled," or paused, when "a litigant has pursued his rights diligently, but some extraordinary circumstance prevents him from bringing a timely action." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014). The applicability of tolling is "fundamentally a question of statutory intent." *Id.*

Because the statute of limitations for a *Bivens* action is drawn from state law, its tolling principles are also borrowed from state law. *Starks v. Hollier*, 295 F. App'x 664, 665 (5th Cir. 2008). Under Texas law, state courts apply equitable tolling only in rare, extraordinary cases. For example, tolling may apply when the claimant "filed a defective pleading during the statutory period," or was "induced or tricked by his adversary's misconduct into allowing filing deadlines to pass." *Bailey v. Gardner*, 154 S.W.3d 917, 920 (Tex. App. 2005). Tolling may also apply when the claimant "is prevented in some extraordinary way from asserting his rights." *Teemac v. Henderson*, 298 F.3d 452, 457 (5th Cir. 2002) (quoting *United States v. Patterson,* 211 F.3d 927, 930 (5th Cir.2000)).

The FTCA's presentment and filing deadlines are also subject to equitable tolling. *United States v. Wong*, 575 U.S. 402, 410–412, 420 (2015) (holding that the "FTCA's time bars are nonjurisdictional and subject to equitable tolling"). The federal tolling principles

are similar to those used by Texas courts; tolling applies when a claimant diligently seeking a judicial remedy filed "a defective pleading during the statutory period" or was tricked into missing filing deadlines by "his adversary's misconduct." *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990).

Here, the undersigned concludes that none of Little's *Bivens* claims are saved by equitable tolling. Little offers no evidence that the defendants purposefully caused him to miss filing deadlines through misconduct, or that extraordinary circumstances prevented him from filing a timely claim.[16] He also does not allege that he filed any claim, defective or otherwise, within the limitations period.

For the same reasons, tolling does not apply to Little's FTCA claims; however, even if the presentment deadline were tolled, it would still be necessary to dismiss his FTCA claims for lack of jurisdiction. Although the FTCA presentment *deadline* is non-jurisdictional, and thus subject to equitable tolling, the presentment *requirement* is jurisdictional. *Compare Wong*, 575 U.S. at 420, *with McNeil v. United States*, 508 U.S. at 113. Thus, even if the presentment deadlines were tolled, Little would still be required to present his FTCA claims to the BOP and receive a final denial before jurisdiction would vest in this Court. Failure to satisfy presentment warrants dismissal of Little's FTCA claims regardless of tolling.

---

[16] Little could argue that the defendants concealed some of his conditions until he received his medical records in December 2023. However, each *Bivens* claim arising from a condition first revealed in his records already survives the limitations test through the federal discovery rule. Because the delayed notice of his conditions has not prevented him from asserting any claims, it does not provide a basis for equitable tolling.

### 5. *Summary of Limitations Analyses*

Based on the above, the undersigned finds that Little's failure to satisfy the FTCA's jurisdictional presentment requirement mandates dismissal of all construed FTCA claims; because none of these claims are subject to equitable tolling, this dismissal is effectively with prejudice for those claims that accrued more than two years before he filed his Complaint. Of his remaining *Bivens* claims, only the following fall within the statute of limitations: (1) claims arising from treatment of his neck injury on May 15, 2022; (2) claims arising from his fall in January 2023; (3) claims arising from his lower back fracture, osteopenia, low blood platelets, and bundle branch block; and (4) claims arising from his denied care level III transfer.[17]

Because each of Little's remaining claims are constitutional claims under *Bivens*, the undersigned will briefly introduce the legal standard for Eighth Amendment medical treatment claims, then screen each of Little's claims.

### B. *Bivens* Legal Standard

An inmate may bring a *Bivens* action for damages based on a prison official's failure to provide adequate medical treatment under the Eighth Amendment. *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017). Under the Eighth Amendment, prison officials have a duty to provide adequate medical care to prisoners. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). To establish a violation of this duty, a prisoner must allege facts showing that prison officials were, at a minimum, "deliberately indifferent" to his objectively serious medical

---

[17] While Little has not plausibly alleged that his chest pain and shortness of breath claims arose within the limitations, his pleadings also do not preclude this possibility. The undersigned will briefly discuss the claims arising from this injury when relevant.

needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014). "Deliberate indifference" means that the denial of medical treatment was, objectively, "much more likely than not to result in serious medical consequences, and additionally that the defendants had sufficient knowledge of the situation so that the denial of medical care constituted wanton disregard of the prisoner's rights." *Johnson v. Treen*, 759 F.2d 1231, 1238 (5th Cir. 1985). Thus, the standard incorporates both an objective component and a subjective one.

First, the prisoner must establish that he was objectively exposed to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). The objective prong requires showing that the prisoner had a serious medical need. *Lewis v. Cain*, 701 F. Supp. 3d 361, 433 (M.D. La. 2023), *appeal dismissed sub nom. Parker v. Hooper*, 128 F.4th 691 (5th Cir. 2025). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert*, 463 F.3d at 345 n. 12; *see also id.* at 346 n. 17 (noting that there was no dispute that a head wound, which would become infected if not treated, posed a substantial health risk).

As to the subjective component, the prisoner must show that the officials "(1) were aware of facts from which an inference of excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed." *Burleson v. Texas Dep't of Crim. Just.,* 393 F.3d 577, 589 (5th Cir. 2004). Mere "'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." *Domino v. Texas Dep't of Crim. J.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1944)). While it

can be difficult to directly demonstrate what risks an official was subjective awareness of, his awareness can be inferred from circumstantial evidence, as well as from obvious risks that are "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." *Farmer*, 511 U.S. at 842–43.

Unsurprisingly, the deliberate indifference standard is a steep one for plaintiffs to satisfy. *See Domino*, 239 F.3d at 756. Deliberate indifference is shown by intentional disregard; allegations of "negligence or even gross negligence" are insufficient. *Shumpert v. City of Tupelo*, 905 F.3d 310, 316 (5th Cir. 2018); *Gobert*, 463 F.3d at 346. In the context of a medical needs claim, this means that "the plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021). Allegations of medical malpractice, failure to accurately diagnosis, or failure to provide additional treatment fall short of the deliberate indifference pleading standard, as does a prisoner's mere disagreement with the treatment provided. *Estelle*, 429 U.S. at 105–07; *Domino*, 239 F.3d at 756; *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

Turning now to Little's allegations, the undersigned will examine his claims against each of the Defendants.

### C. *Bivens* Claims Against BOP Medical Staff

Little first asserts Eighth Amendment medical treatment claims generally against

the BOP medical staff, including Dr. Wright and Dr. Winger.[18] To organize screening of these claims, the undersigned has categorized them as follows: (1) allegations based on treatment of Little's neck injury on May 15, 2022; (2) allegations based on failure to diagnose or identify various injuries; (3) allegations based on failure to recommend further testing, treatment, or aids for identified injuries; and (4) allegations based on refusal to treat various conditions.

### 1. *Claims Arising from May 2022 Neck Injury*

First, Little alleges that Big Spring medical staff failed to promptly or properly address his neck injury. After notifying a SHU guard of his neck injury, he waited more than two hours before anyone came to bring him to the medical office. Dkt. No. 19 at 20–21. Little was forced to walk upstairs to the medical office while in handcuffs. Dkt. No. 19 at 21. When he was seen by the nurses, they urged the doctor to send him to the hospital for treatment. Dkt. No. 19 at 21. However, he was not provided a C-collar to protect his neck during transport to the ER. Dkt. No. 19 at 21. Little also alleges that he was forced to walk in a "belly chain and shackles" from the office to the transport van, and from the van to the ER building.[19] *Id.*

Based on these facts, it is plausible that Little objectively faced a substantial risk of serious harm. Even before Little's neck injury was determined to be a neck fracture, he

---

[18] Based on the medical record, Dr. Wright and Dr. Winger were generally involved in treating Little's conditions or co-signing on treatment provided by other physicians. Because they are also named defendants, the undersigned will later consider any allegations that Little raises against them specifically.

[19] Little also complains that, once at the ER, a neck brace was put on forcefully in a way that hurt him, that a nurse suspected he was faking the pain, and that he was made to climb onto gurneys and an operating table without assistance. *Id.* However, these claims involve medical staff at the Scenic Mountain Medical Center ER, not BOP medical staff.

alleges that the BOP nurses immediately urged that he be taken to the ER for treatment. Dkt. No. 19 at 21. That the BOP staff recommended immediate treatment for Little's injury suggests that his condition created a serious medical need, and in turn that he faced a substantial risk. *Gobert*, 463 F.3d at 345 n. 12. In addition, the undersigned concludes that the need posed by Little's condition—a tilted neck that he was unable to straighten—is so apparent that even a layman would recognize the necessity of treatment. *Id.*

However, Little has not alleged that the BOP medical staff were deliberately indifferent to the risk he faced. First, Little does not allege that the two-hour delay in treatment arose from deliberate indifference. Allegations of deliberate indifference must show some degree of intentional conduct, such as refusal to provide treatment or intentionally providing incorrect treatment. *Domino*, 239 F.3d at 756; *see, e.g., Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 418, 422 (5th Cir. 2017) (holding that a prisoner plausibly alleged deliberate indifference when prison official ignored multiple complaints from the prisoner, took pictures of the prisoner, and then waited an hour before taking him to the hospital).

Here, Little's pleadings seem to place blame for the delay in treatment on the SHU guard's failure to "call [a] man down" rather than the medical staff ignoring his complaint. Dkt. No. 19 at 21. But even assuming the medical staff were immediately notified of his condition, Little does not allege that he repeatedly sent them complaints, or that they ignored him upon seeing his condition. Instead, his pleadings indicate that he simply sat and waited after notifying a single officer. Dkt. No. 19 at 20. Once the nurses did see Little, they immediately urged that he be taken to the ER for treatment. Dkt. No. 19 at 21. While

Little claims that the nurses had to "strongly suggest" to the doctor to send him to the hospital, the doctor ultimately did permit him to go. *Id.* These facts indicate that any delay in treating Little's neck injury did not arise from the deliberate indifference of the BOP medical staff.

Second, Little fails to demonstrate that the nurses acted with deliberate indifference when they required him to walk in shackles without a C-collar. Deliberate indifference requires a showing of wanton disregard, which can be demonstrated by refusal to provide treatment or purposeful incorrect treatment. *Domino*, 239 F.3d at 756. Here, Little's pleadings do not evidence this degree of neglect. Little does not allege that the BOP nurses refused to provide him with a C-collar, as he notes that he never requested one. Dkt. No. 19 at 23. Nor does he allege that the nurses intentionally transported him incorrectly; instead, he frames his claims in terms of negligence arguing that the Defendants should have taken more precautions and "[done] their job properly." *Id.* at 22–23.

Indeed, the facts alleged suggest that the Defendants may have been unaware of the severity of Little's condition. Little acknowledges that he was able to walk to the prison clinic, walk to the front of the building, and board the prison van, all notwithstanding being cuffed and shackled. Dkt. No. 1 at 21. Other than his "tilted neck," there are no facts alleged that would have put Defendants on notice that Little had a broken neck or other incapacitating injury. *Id.* While the emergency room staff, with whom he apparently finds no fault, gave him a C-collar shortly after arrival, even they required him to walk to operating rooms and climb onto gurneys by himself. *Id.*

At base, Little believes that Defendants should have done more. With the benefit of

hindsight, this might well be true. But deliberate indifference must be measured at the time of the official's actions, not later with the benefit of hindsight. *Zaunbrecher v. Gaudin*, 641 F. App'x 340, 346 (5th Cir. 2016) ("hindsight . . . only distort[s] our deliberate indifference analysis.") (citing *Domino*, 239 F.3d at 756). Defendants' failure to place a C-collar on Little's neck was, at most, a mistaken medical judgment, one that was made while transporting him to the hospital for further evaluation. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned" as an Eighth Amendment violation. *Farmer*, 511 U.S. at 838.

For these reasons, the undersigned finds that Little has not sufficiently alleged that the BOP medical staff acted with deliberate indifference as to his neck injury.

### 2. *Alleged Failure to Diagnose Conditions*

Next, Little alleges that the BOP medical staff failed to diagnose or identify particular conditions he suffered from. Little provides two injuries that the BOP failed to identify: his lower back fracture and his osteopenia or low bone density.

Little alleges that the BOP received x-rays that revealed these conditions. On April 26, 2021, x-ray imaging revealed various "vertebral anomalies," such as "degenerative disc space narrowing" and "moderate facet arthropathy." Dkt. Nos. 1 at 17, 1-1 at 4. Later x-ray imaging taken on May 19, 2022, revealed a new fracture in his lower back. Dkt. No. 1-1 at 5. The radiologist also reported that Little had osteopenia based on the 2022 x-ray.[20] *Id.*

---

[20] While not referenced in Little's pleadings, the April 2021 imaging report also stated that Little had osteopenia.

Little did not discover he had either condition until he received his medical records on December 13, 2023. *Id.* at 4. Little also did not receive any treatment for his osteopenia or back fracture from the BOP. Dkt. No. 19 at 24–25. Little claims that the BOP took no action because they failed to review or recognize these abnormal findings. Dkt. No. 1 at 13.

Assuming that Little's conditions objectively exposed him to a substantial risk of harm, he nonetheless fails to raise an Eighth Amendment claim because he has not alleged that the Defendants acted with deliberate indifference. Failure to identify or diagnose a condition is at most negligence or malpractice, not deliberate indifference. *Estelle*, 429 U.S. at 106; *see also Domino*, 239 F.3d at 756 ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.").

In addition, the medical record indicates that Little did receive treatment that addressed the risks posed by these conditions. Little's Complaint refers to many of the treatments he was provided that also addressed these risks, including housing reassignment to the first floor, transfer to the SHU, provision of a cane and walker, and exemption from work assignments. Dkt. Nos. 1-1 at 4–5, 11–13; 19 at 26. Given that the BOP was already providing care that addressed the risks these conditions posed, their failure to provide an independent diagnosis or treatment does not show deliberate indifference as to those conditions.

For these reasons, the undersigned finds that Little has not sufficiently alleged that the BOP medical staff acted with deliberate indifference as to his back injury or osteopenia.

### 3. *Alleged Failure to Sufficiently Treat Conditions*

Next, Little alleges that the BOP failed to recommend further testing or treatment

28

based on his symptoms or conditions. Some of the tests Little claims the BOP should have performed include: (1) bone density tests and vitamin D deficiency tests for his osteopenia, Dkt. No. 1-1 at 2; (2) a pulmonary function test for his chest pain and shortness of breath, *id.* at 3; and (3) a carotid doppler study and tests to rule out a heart condition, brain clot, or chemical imbalance as causes of his fainting spells, Dkt. Nos. 1 at 21, 1-1 at 3. Little also alleges that he should have been referred to various specialists, such as a cardiologist for his bundle branch block, a hematologist for his low platelets, and an orthopedic surgeon for his lumbar spine abnormalities. Dkt. Nos. 1 at 13–14, 1-1 at 4.

Little further alleges that the BOP should have provided better mobility aid devices to prevent him from falling. Little was first assigned a cane by Dr. Winger in 2020 when he began having difficulties walking long distances. Dkt. No. 19 at 26. His records and Complaint show that the cane was replaced with a walker after he suffered another fall in January 2022. *Id.* Nonetheless, Little insists that he should have been assigned a wheelchair or walker with a seat; he alleges that when he requested a walker with a seat, he was told there were none available. Dkt. Nos. 1 at 19, 1-1 at 1. Little also suggests that his meals should have been brought to him rather than having to walk to the chow hall, potentially in the rain or ice, to get his food. Dkt. No. 1 at 19.

Lastly, Little alleges that the BOP failed to disclose particular conditions to him. Imaging performed in May 2022 revealed that he had osteopenia and a lower back fracture. Dkt. No. 1-1 at 5. An EKG performed at the same time revealed that Little had a bundle branch block. *Id.* Little also alleges that his records revealed he had low blood platelets as early as 2019. *Id.* Despite possessing the reports revealing these conditions, the BOP staff

29

never called him in to review these findings and allegedly took no measures to address them. Dkt. No. 1 at 5, 13. As a result, Little did not learn about these conditions until he received his medical records on December 13, 2023, and reviewed them independently. *Id.* at 10. Little alleges that he is suffering from medical neglect of these conditions as a result of the BOP's misconduct. Dkt. No. 1 at 5, 13.

In each case, Little again fails to allege deliberate indifference. The decision to provide further treatment, such as further testing or referral to a specialist, is "a classic example of a matter for medical judgment" that does not constitute deliberate indifference. *Estelle*, 429 U.S. at 107. Little's medical records also shows that treatment was either provided for his conditions, such as glasses to improve his vision or a cane or walker for his mobility, or was deemed medically unnecessary, such as assessment of his blood platelets as "low" rather than "low critical." The degree of treatment he received was responsive to new events; for example, he was first assigned a cane as a mobility aid, but it was later replaced with a more appropriate walker. Dkt. No. 19 at 26. His medical records also show that he was referred to specialists when appropriate, including radiologists after various falls and a neurosurgeon after his neck was injured in May 2022. Dkt. No. 19 at 22. That Little believes further treatment or mobility aids should have been provided does not demonstrate that the BOP disregarded his medical needs.

The BOP's failure to call Little in to review his conditions also does not rise to the level of deliberate indifference. Whether construed as an effort to withhold treatment or as an attempt to improperly delay treatment, Little must still allege that the failure to disclose his health conditions was intentional. *Domino*, 239 F.3d at 756. Here, Little instead claims

30

that the BOP failed to disclose these conditions because they never discovered them. Dkt. No. 1 at 13. As discussed in the prior section, failure to discover or diagnose a condition is not deliberate indifference. *Domino*, 239 F.3d at 756. Because Little has not plausibly alleged that the Defendants were both aware of these conditions and deliberately concealed them, he has not demonstrated the intentional conduct needed to plead deliberate indifference.

For these reasons, the undersigned finds that Little has not plausibly alleged that the BOP medical staff acted with deliberate indifference by failing to adequately treat his diagnosed medical conditions.

### 4. *Alleged Refusal to Treat Conditions*

Next, Little alleges that BOP staff ignored or refused to treat his chest pain.[21] After Little contracted Covid-19 in September 2020, he developed chest pain and suffered from shortness of breath. Dkt. Nos. 1 at 18, 1-1 at 4. Little alleges that when he complained to health services, "the nurse just seem[ed] to ignore [his] complaints." Dkt. No. 1 at 18.

At the outset, Little has not sufficiently alleged that his chest pain and shortness of breath posed a substantial risk of serious harm. No physician has recommended treatment for his chest pain or short breath; his medical records also contain several pulmonary and cardiovascular examinations, each reporting results within normal limits. The undersigned also concludes that chest pain and short breath do not pose so apparent a need that a layman would recognize that care was necessary. Because treatment has not been recommended

---

[21] While Little has not plausibly alleged that this incident falls within the limitations period, it remains possible that it occurred after April 2022. The undersigned has chosen to briefly consider the claim here out of an abundance of caution.

for his condition, and the need for treatment is not obvious to a layman, Little has not alleged the existence of a serious medical need that implicates the Eighth Amendment. *Gobert*, 463 F.3d at 345 n. 12.

But assuming that his symptoms did pose a serious medical need, Little has also failed to allege that the nurse was deliberately indifferent to his needs. Little alleges only that the nurse *seemed* to ignore his complaints, Dkt. No. 1 at 18, and not that the nurse *actually* ignored his medical needs. Little also does not allege facts permitting an inference of intentional disregard; he alleges only what the nurse seemed to think about his complaints, and speculation about the nurse's mental state is not a "fact" that the undersigned must accept as true. *See, e.g., Bilbrew v. Johnson*, 239 F. App'x 49, 51 (5th Cir. 2007) (holding that allegations based on "personal beliefs" were insufficient to state a claim). Little alleges no other facts indicating that the nurse acted with deliberate indifference.

Little also describes other conditions, such as low platelets, Covid-19, and a bundle branch block, that together could suggest his chest pain and breathing problems were symptoms for more serious conditions. *Id.* However, Little does not allege that he discussed these conditions when complaining of short breath and chest pain; in fact, Little was not even aware of his low platelets or bundle branch block until he received his medical records in December 2023. Dkt. No. 19 at 27. Thus, the undersigned cannot assume that the nurse was aware of these conditions; even if she was aware, failure to properly diagnose a condition that potential complicating factors would have revealed is at most malpractice, not deliberate indifference. *Estelle*, 429 U.S. at 106.

For these reasons, the undersigned finds that Little has not sufficiently alleged that

his chest pain or short breath presented a serious health need, or that the nurse acted with deliberate indifference to that need.

### 5. Conclusion

Based on the discussion above, the undersigned concludes that Little has failed to plausibly allege deliberate indifference or an objectively serious medical need as to the injuries discussed above. As such, Little has failed to state an Eighth Amendment claim against the BOP medical staff based upon these facts. These *Bivens* claims should be dismissed.

### D. *Bivens* Claims Against Dr. Winger and Dr. Wright

In addition to making general allegations against F.C.I. Big Spring medical staff, Little also names two staff members, Dr. Winger and Dr. Wright, as defendants. Rather than allege that either defendant improperly treated him, Little instead appears to rely on their supervisory role as Medical Directors. Dkt. No. 1 at 2–3. To the extent he does so, he fails to state a claim under the Eighth Amendment; in a *Bivens* action, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

However, portions of Little's Complaint mention in passing the role these defendants played in his treatment. For example, Dr. Winger is identified as the one who initially assigned Little his cane to assist in walking long distances. Dkt. No. 19 at 26. Dr. Wright is also identified as the one who provided treatment after the fall that injured Little's neck in May 2022 and his subsequent altercation with a fellow inmate. Dkt. No. 1-1 at 5. Little's medical records also indicate that these doctors are among those that provided or co-signed

various treatments throughout 2021 and 2022; in particular, Dr. Wright ordered and co-signed the radiologist report in 2022 that included Little's osteopenia diagnosis.

Even considering these factual allegations, the Defendants' conduct is not meaning-fully different from the conduct of the medical staff already discussed in the prior section. At worst, Dr. Wright and Dr. Winger failed to diagnose particular conditions or recommend further treatment once they were brought to their attention; while this conduct may consti-tute medical malpractice, it is not sufficient to show deliberate indifference. *Estelle*, 429 U.S. at 106. Little's failure to plead any facts from which the Court could reasonably infer these Defendants' mental state is fatal to his claims of deliberate indifference.

For these reasons, the undersigned finds that Little fails to state a claim under the Eighth Amendment against Dr. Winger or Dr. Wright. The claims against them should be dismissed.

### E. *Bivens* Claims Against Warden C. Stern

Little next alleges that the Big Spring warden, C. Stern, violated his Eighth Amend-ment rights when he denied Little's request for transfer to a care level III facility. Dkt. No. 1 at 7. Specifically, Little requested transfer to Terminal Island, the facility closest to his home state of Nevada. Dkt. No. 1-1 at 11. After Little's BP-8 requesting transfer was denied for failure to satisfy the transfer guidelines, *id.* at 12–13, filed a BP-9 arguing that his medica history and needs justified transfer and asking that his request be given to the War-den for approval. *Id.* at 11. Little never received a copy of the warden's response, but al-leges that on February 22, 2024, he was advised that the warden had denied his BP-9 be-cause he did not meet the care level III transfer requirements. Dkt. Nos. 1 at 7–8, 19 at 23.

By the time he received this notice, it was too late to file further grievances. Dkt. No. 19 at 24.

In order to bring a *Bivens* action based on these facts, Little must allege that Stern's denial constituted deliberate indifference to Little's serious medical needs. The undersigned notes that Little's BP-9 relies on constitutional needs beyond medical care: he argues that he will be safer at a level III facility because he would be less likely to suffer a fall, and references the flooring and lighting conditions at Big Spring as reasons justifying transfer. Dkt. No. 1-1 at 3, 8–9. While inmates have an Eighth Amendment right to reasonably safe facilities, *Farmer*, 511 U.S. at 832–33, an Eighth Amendment *Bivens* action may be premised only on denial of adequate medical care. *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017). Thus, Little may assert a *Bivens* claim against Stern only to the extent that his transfer request was based on medical care.

Here, Little fails to allege that Stern denied him medical care or was deliberately indifferent to his medical needs. Little's medical basis for seeking transfer was essentially that F.C.I. Big Spring was not adequately treating his conditions, and he would receive better treatment at a care level III facility. Dkt. Nos. 1 at 6, 1-1 at 1–3. As discussed throughout this analysis, Little was already receiving treatment or evaluation for most of his conditions, but Little nonetheless argues that he should have received more extensive testing or treatment. Many of those arguments were reasserted in his BP-9 Form. *Id.* Thus, Stern denying Little's transfer request could be construed as a denial of further treatment. However, the decision to send an inmate to a facility to receive further treatment is analogous to the decision to provide further treatment, which is a "classic example of a matter for

35

medical judgment" that does not constitute deliberate indifference.[22] *Estelle*, 429 U.S. at 107.

Stern's decision that a level III transfer was not warranted comports with the extensive medical record of treatments and accommodations Little has received. The BP-9 Little submitted to the Warden even discusses some of these actions, such as removing him from work assignments, granting him a first-floor housing restriction, transferring him to SHU housing, providing him a cane, and performing regular medical diagnostics. *Id.* at 5–6. That Little believes he should be transferred to a Level III facility to receive further treatment does not mean that failure to do so amounts to denial of treatment or wanton disregard for his medical needs. *See, e.g., Stewart v. Murphy*, 174 F.3d 530, 535–37 (finding that the defendants did not act with deliberate indifference when denying a prisoner's transfer request because they were actively treating his serious condition).

For these reasons, the undersigned finds that Little fails to state a claim under the Eighth Amendment against warden C. Stern. The claim against him should be dismissed.

## F. *Bivens* Claims Against SHU Guards

Lastly, Little alleges that the SHU guards on duty during May 2022 violated his Eighth Amendment rights. Construing his pleadings liberally, the undersigned finds the following allegations raised against the SHU guards. Little alleges that the water at Big

---

[22] While Stern, the warden at Big Spring, is not a medical professional, Little's pleadings indicate that the transfer decision was premised on an assessment of his medical needs. Little was told that his BP-9 was rejected because he did not meet the criteria for a Level III transfer, Dkt. No. 1 at 8, and the response to his BP-8 states that the BOP guidelines require the need for a care level III transfer to be "clinically indicated." Dkt. No. 1-1 at 12. To the extent Stern relied on these medical guidelines, he did not act with deliberate indifference.

Springs was terrible and that he refused to drink it; when he asked guards for water during meals, he was told to drink water from his sink. Dkt. No. 19 at 20. He alleges that he passed out on May 15, 2022, because he was dehydrated, and thus his neck injury could have been prevented had he received drinkable water. *Id.* After notifying a guard about his injury, the guard told Little that he would notify medical. *Id.* However, medical staff did not arrive until two hours later; when they did arrive, Little was forced to walk to medical in cuffs for evaluation. *Id.* The next day, Little was assaulted by a fellow SHU inmate in front of the cells and fell backwards.[23]

First, Little fails to state a claim based on the water provided in the SHU. "Obviously, potable water is a basic human need and must be provided to inmates." *Simmons v. Hooper*, Civil Action No. 1:18-CV-0069-BU, 2021 WL 861716, at *24 (N.D. Tex. Jan. 13, 2021), recommendation adopted by 2021 WL 859129 (Mar. 8, 2021). However, there is no constitutional right to pleasant drinking water.[24] Unlike the plaintiffs in *Colby* and *Lee*, who described their drinking water as bad tasting, foul smelling, or discolored, Little refers to his drinking water generally as "bad" or "too terrible to drink." Dkt. No. 19 at 20, 25.

---

[23] Little's pleadings also allude to this incident, and he claims his neck and spine injury arose from them. Dkt. No. 1 at 5. He later clarifies in his questionnaire that these injuries actually occurred when he fainted in his cell. Dkt. No. 19 at 20. The medical record he cites also aligns with this narrative; he mentions a report that states he "stood up quickly [on] Sunday and fell," and after "[on] Monday he was assaulted by celle [sic]." Dkt. No 1-1 at 5.

[24] *Colby v. Gusman*, No. CIV.A. 10-1004, 2010 WL 5477681, at *12 (E.D. La. Nov. 23, 2010), *report and recommendation approved,* No. CIV.A. 10-1004, 2010 WL 5475617 (E.D. La. Dec. 28, 2010) (holding no constitutional violation when prisoner's water was "brown" and tasted "horrible"); *Lee v. Davis*, No. 6:21CV147, 2021 WL 4185881, at *1, 3 (E.D. Tex. Aug. 9, 2021), *report and recommendation adopted,* No. 6:21-CV-147-JDK-KNM, 2021 WL 4168610 (E.D. Tex. Sept. 14, 2021) (holding no constitutional violation when prisoner provided "foul smelling and dark colored drinking water" because it was insufficient to establish the water as unsafe); *Hall v. Braxton*, No. 7:10-CV-00197, 2010 WL 2332594 (W.D. Va. June 9, 2010) (noting that "allegation that the water is brown" is insufficient to show the drinking water was unsafe).

These general assertions are insufficient for the undersigned to conclude Little's right to drinkable water was violated. Moreover, Little fails to plausibly allege facts showing that he was harmed by drinking the water; he alleges only that he became dehydrated when he refused to drink it. Dkt. No. 19 at 20. Standing alone, Little's subjective belief that the water was harmful is insufficient to demonstrate that it was constitutionally inadequate.

But even assuming that the water provided was fell short of constitutional requirements, a prisoner's right to drinkable water is distinct from his right to adequate medical care.[25] It is the medical condition of dehydration, and not the inadequate provision of water, that implicates a prisoner's right to medical care. This was the case on the other occasion where Little fainted from dehydration—there, he was provided adequate medical treatment in the form of IV fluid. Dkt. No. 19 at 25. Because Little is asserting a *Bivens* claim, he can only allege violations of his Eighth Amendment right to medical care, not his Eighth Amendment right to adequate water. Expansion of *Bivens* remedies to a new context or category of defendants is a "disfavored judicial activity" courts consistently refuse to engage in. *Butler v. Porter*, 999 F.3d 287, 293 (5th Cir. 2021). Thus, Little cannot allege injuries arising from a lack of drinkable water under *Bivens*, especially here were he makes no allegation that Big Spring staff withheld treatment afterwards.

Second, Little fails to plausibly allege that the delay in treatment for his neck arose from deliberate indifference. Little claims that it took two hours for medical staff to arrive

---

[25] *Cf. Farmer*, 511 U.S. at 832 (listing "adequate food" and "medical care" as separate human needs prisoners must receive under the Eighth Amendment); *Colby*, 2010 WL 5477681 at *12 (considering "food and water" together as basic needs prisoners must be provided).

because the SHU guards "did not call [a] man down." Dkt. No. 19 at 20. However, Little makes no factual allegations to support his claim that his request for medical help was ignored. Prior cases where prisoners successfully raised claims based on delays in care included factual allegations showing that the delay arose from intentional conduct. *See e.g.*, *Easter v. Powell*, 467 F.3d 459, 464–65 (5th Cir. 2006) (nurse refused to provide prescribed nitroglycerine to a prisoner she knew had cardiac issues); *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999) (doctors refused to treat inmate's broken jaw despite multiple complaints of excruciating pain). By comparison, the officer in this case was informed of Little's medical complaint only once; the fact that medical staff arrived without further action from Little indicates that the officer relayed Little's condition to the medical department. The undersigned does not find it plausible from the two-hour delay alone that the correctional officer ignored Little's serious medical need.[26]

Next, Little fails to allege deliberate indifference based on the SHU guards' failure to provide a C-collar or gurney when transporting him to medical. As discussed earlier, failure to provide a C-collar or gurney likely exposed Little to an objective risk of injury. However, because Little has not alleged that he asked for a collar and was denied one, or that the SHU officers intentionally transported him incorrectly, the facts alleged do not indicate wanton disregard for Little's needs. *Domino*, 239 F.3d at 756. Little also does not allege that the guards knew Little's neck was fractured when they transported him; given

---

[26] Little also does not allege that any other officers saw his condition and ignored it. The only other officer he mentions is the one who conducted the morning count, but he had already passed Little's cell before he fell. Dkt. No. 19 at 20.

that the Big Spring medical staff and emergency room physicians also failed to recognize the fracture prior to imaging, Dkt. No. 1 at 21, the undersigned finds it implausible to conclude that the SHU guards recognized the severity of his condition. In short, Little has not provided enough facts to plausibly infer that the guards were deliberately indifferent rather than negligent.

Lastly, Little cannot allege a claim against the SHU guards based on the assault he suffered at the hands of his fellow inmate. While inmates have an Eighth Amendment right to be protected from other inmates, *Farmer*, 511 U.S. at 832–33, this right is distinct from an inmate's right to adequate medical care. As discussed prior, Little cannot expand his *Bivens* remedy to violations of his Eighth Amendment right to protection from other inmates. *Butler*, 999 F.3d at 293 (noting that *Bivens* remedies cannot be expanded to new constitutional rights). The facts in the medical record indicate that Little was promptly taken to medical for evaluation after he was attacked, and his Complaint even references a follow-up medical visit within a week of the incident. Dkt. No 1-1 at 5. Thus, the facts alleged do not indicate that the SHU guards on duty disregarded Little's medical needs after he was attacked.

For each claim Little could bring against the SHU guards, he either alleges wrongs beyond the permissible scope of *Bivens* or fails to allege sufficient facts to plausibly infer deliberate indifference. The undersigned therefore finds that Little has failed to state a *Bivens* claim against the SHU guards. The claims asserted against them should be dismissed.

### G. Summary

For each of Little's claims, he has either failed to satisfy the deliberate indifference standard required for Eighth Amendment violations, or alleged claims that fall beyond the scope of *Bivens*. Thus, the undersigned concludes that Little has failed to state a claim against the Defendants based on alleged violations of his Eighth Amendment right to adequate medical care under *Bivens*. For this reason, none of Little's *Bivens* claims survive judicial screening.

## VI. LEAVE TO AMEND

Still, there is the issue of whether the Court must give Little leave to amend his complaint. Generally, "a *pro se* litigant should be offered an opportunity to amend his complaint before it is dismissed." *Brewster v. Dretke*, 587 F.3d 764, 767–68 (5th Cir. 2009). Leave to amend is not required, however, where an amendment would be futile, in other words, the amended complaint would still fail to state a claim, *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014), or where a plaintiff has already received an opportunity to amend his or her claims, *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 556 (5th Cir. 2007).

Here, the undersigned concludes that leave for further amendment would be futile. Little has already been given leave to supplement his pleadings through the Court's questionnaire, and his pleadings have been contextualized through an extensive medical record. Little also submitted his BP-8 and BP-9 as an attachment to his Complaint, in which he again describes his injuries, medical needs, and alleged lack of treatment. Dkt. No. 1-1. Between his Complaint, grievances, and Questionnaire responses, Little has had ample

41

opportunity to allege the facts needed to survive judicial screening.

Based on the history of past and present treatment described in Little's pleadings and medical record, it does not appear that he can plausibly allege that any of the named defendants were deliberately indifferent to his medical needs. Instead, the bulk of Little's Complaint and Questionnaire responses are premised on "medical malpractice and incompetence." Dkt. Nos. 1 at 19, 21–22; 19 at 22–23, 25. While his allegations of malpractice could survive as FTCA claims, Little fails to allege the presentment requirements needed to grant this Court jurisdiction under the FTCA. Given that Little brought this civil action under *Bivens* rather than the FTCA, the undersigned finds it unlikely that Little has gone through the BOP's FTCA claims process.

Because Little's thoroughly developed pleadings fail to state a claim under *Bivens* or establish jurisdiction over his FTCA claim, the undersigned concludes that further leave to amend would be futile.

## VII.  CONCLUSION

For the reasons above, the undersigned RECOMMENDS that the Court:

(1) DISMISS Little's FTCA claims against all Defendants without prejudice for lack of jurisdiction.

(2) DISMISS Little's time-barred *Bivens* claims with prejudice; and

(3) DISMISS Little's remaining *Bivens* claims without prejudice for failure to state a claim on which relief may be granted.

## VIII.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on

all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## IX. TRANSFER OF CASE

Having completed the preliminary screening of Little's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action No. 1:24-CV-00059-H.

ORDERED this 30th day of December 2025.

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE

43